UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

YONATAN KLEIN,

                     *Plaintiff*,

    -against-

LAKEVIEW FIRE DISTRICT, LAKEVIEW FIRE
DEPARTMENT, FREDERICK G. SENTI, JR.,
FREDERICK G. SENTI, III, JAMES GALIA,
MICHAEL KOPPEL and HEATHER McNEILL,

               *Defendants*.

-------------------------------------X

**<u>MEMORANDUM AND ORDER</u>**

21-cv-1468 (KAM)(JMW)

**KIYO A. MATSUMOTO, United States District Judge:**

         Plaintiff Yonathan Klein ("Plaintiff") commenced the instant action against Defendants Lakeview Fire District (the "Fire District") and Lakeview Fire Department (the "Fire Department") (together, "Lakeview"), and Defendants Fredrick G. Senti, Jr. ("Senti Jr."), Fredrick G. Senti, III ("Senti III"), James Galia ("Galia"), Michael Koppel ("Koppel"), and Heather McNeill ("McNeill") (together, the "Individual Defendants" and, collectively with Lakeview, "Defendants") pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights under the First, Fifth, and Fourteenth Amendments. (*See* ECF No. 1 ("Compl.") at 2-3.) Plaintiff also alleges claims for retaliation, intentional infliction of emotional distress, and a

hostile work environment pursuant to New York state law. (*See id.* at 3.)

Presently before the Court is Defendants' motion to dismiss the Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) with respect to Plaintiff's constitutional claims. (*See* ECF No. 27, Defendants' Motion to Dismiss ("Mot. to Dismiss").) Defendants further request this Court, once it dismisses the constitutional claims, to decline supplemental jurisdiction over Plaintiff's state law claims pursuant to 42 U.S.C. § 1376(c)(3) and Federal Rule of Civil Procedure 12(b)(1). For the reasons set forth below, Defendants' motion to dismiss is **DENIED IN PART** and **GRANTED IN PART**.

<u>**BACKGROUND**</u>

For the purpose of deciding Defendants' Rule 12(b)(6) motion, the Court accepts as true the well-pleaded factual allegations in the Amended Complaint and exhibits attached thereto (*see* ECF Nos. 20-21) and draws all reasonable inferences in Plaintiff's favor. *See Sabir v. Williams*, 37 F.4th 810, 814 (2d Cir. 2022); *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of*

*N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation omitted).  Based on the foregoing, this Court accepts as true the following allegations.

### I.   Factual Background

Plaintiff was a volunteer firefighter at Lakeview Fire Department from February 2011 to January 2021 and served as a Second Lieutenant from February 2017 through November 2019. (ECF No. 20, Amended Complaint ("AC") ¶¶ 10, 61.

Lakeview Fire District is the administrative establishment overseeing operations for the Lakeview Fire Department, a volunteer fire department, and serves West Hempstead, a hamlet in the Town of Hempstead, County of Nassau, State of New York. (*Id.* ¶ 11.)  The Fire District is governed by a Board of Commissioners, which consists of five individuals selected by residents served by the Lakeview Fire District. (*Id.*)

Three of the Individual Defendants—Koppel, Senti Jr., and McNeill—served as Commissioners during the period relevant to the Plaintiff's allegations. (*See id.*)  In addition to Commissioner, Senti Jr. has also served as Chief of the Fire Department, Records Officer, and Secretary and is paid by the Fire Districts' tax-payers. (*Id.* ¶ 13.)  Defendant Senti III, Senti Jr.'s son, is currently a Lieutenant with the Fire Department and previously served as the Chief of Department. (*Id.* ¶¶ 12, 14.) Defendant Galia is currently the Chief of the Fire Department,

(*id.* ¶ 12), and previously, Defendant Galia served as a Captain and then Assistant Chief. (*Id.* ¶ 15.) Defendant Koppel, in addition to being a Commissioner and Chief Executive Officer of Record, previously served as Chief of the Fire Department. (*Id.* ¶ 16.) Defendant McNeill is Senti Jr.'s daughter, and Senti III's sister, and previously served as Chief of the Fire Department and is currently a Lieutenant and Chair of Lakeview's Board of Fire Commissioners. (*Id.* ¶ 17.) She is also married to non-party Patrick McNeill, who served as Chief of the Fire Department during times relevant to Plaintiff's allegations. (*Id.* ¶ 31.)

### A.   The Initial Incident

Plaintiff alleges a "continuous course of unlawful conduct," (*id.* at ¶¶ 1,2) by the Defendants, precipitated by a physical altercation on November 26, 2017, when Defendant Senti III assaulted another volunteer member, Jack Ackerman ("Ackerman") at the Fire Department's firehouse. (*Id.* ¶ 19.) Plaintiff, who had been nominated and elected as Second Lieutenant in February 2017, and other firefighters, including Salvatore Sinatro ("Sinatro")—the Chief of the Fire Department at the time—witnessed the physical assault by Senti III. (*Id.*) Plaintiff separated the two men and took Ackerman into another room. (*Id.*)

Once separated, Ackerman voiced his desire to report the assault to the Nassau County Police Department. (*Id.*) Plaintiff replied by telling Ackerman that he had every right to do so.

4

(*Id.*)   Ackerman filed a complaint with the Nassau County Police Department, and Senti III was arrested later that day for assault and obstruction of airway and suspended by Lakeview for approximately fifteen days. (*Id.* ¶ 20.)

> **B.   Harassment at the Firehouse and Initial Reports to Authority**

After Senti III's assault of Ackerman and his arrest and suspension, he and his father, Senti Jr., began to harass Plaintiff. (*Id.* ¶ 21.)   After each incident of threatening violence, assaultive behavior, and/or verbal harassment, Plaintiff reported the activities to superior authorities in the Fire District and Fire Department. (*Id.* ¶¶ 15, 25-28, 31, 36.)

Examples of harassment of Plaintiff by the Senti Defendants include: Senti Jr. (1) calling plaintiff derogatory names (*e.g.*, "cunt," "a piece of shit"); (2) physically charging at Plaintiff with a broom handle, and threatening Plaintiff with violence; and (3) driving back and forth past Plaintiff's family home in an official vehicle, causing Plaintiff and Plaintiff's wife to feel unsafe. (*Id.* ¶¶ 21-23.)   Senti III "promise[d]" Plaintiff that he would make Plaintiff's life at work difficult. (*Id.* ¶ 24.)

Senti Jr. also harassed other witnesses to the assault, such as non-party Eli Wein ("Wein"), another firefighter and paramedic. (*Id.* at ¶ 25.)   On or about November 29, 2017, Senti

Jr. confronted Wein regarding a witness statement Wein signed reporting Senti III's assault of Ackerman. (*Id.*)  Not only did Defendant Senti Jr. say to Wein that he intended to harass Plaintiff and Wein until the day they left Lakeview, but he also told Wein that "people can fall downstairs during fires." (*Id.* at ¶ 26.)  "[I]t would just seem like an accident because accidents happen during fires." (*Id.*)

On November 29 and 30, 2017, respectively, Plaintiff and Wein each sent an email memorandum detailing the disturbing behavior of Senti Jr. to Defendant Galia, then the Captain and Assistant Chief of the Fire Department. (*Id.* ¶¶ 25-28; *see also* ECF Nos. 20-1, Exh. 1, Wein Memorandum; 20-2, Exh. 2, Klein Memorandum.)  Defendant Galia did not respond to either memorandum. (*Id.*)

Senti Jr. and Senti III's harassment continued for months.  On March 22, 2018, Senti Jr. and Senti III continued to harass Plaintiff, including Senti III threatening to "knock [his] f—cking head off," and noting that a soft tissue injury was "nothing to what [Plaintiff] would get." (*Id.* ¶ 30.)  Senti Jr. also threatened to knock Plaintiff's teeth out, made repeated comments about Plaintiff's wife, physically charged at Plaintiff and verbally threatened Plaintiff's family. (*Id.*)

On March 23, 2018, Plaintiff sent another email to Defendant Galia, non-party Assistant Chief Michael Joyce

("Joyce"), and Patrick McNeill, who is the husband of Defendant McNeill and then-Chief of the Fire Department, regarding the conduct and verbal abuse by Defendants Senti Jr. and Senti III, and expressed his fear of "imminent and potentially catastrophic retaliation" from Senti Jr. and Senti III. (*Id.* ¶ 31; *see* ECF No. 20-3, Exh. 3, Klein Second Memorandum. Galia failed to respond despite his duty to do so. (*Id.* ¶ 32.)

On October 27, 2018, Senti III and Plaintiff got into another argument, where Senti III came within inches of Plaintiff's face and once again, made threats of physical violence to Plaintiff. (*Id.* ¶ 33.)

Senti Jr. continued threatening Plaintiff, specifically noting Plaintiff's involvement with the discipline of Senti III after Senti III's assault on Ackerman and called Plaintiff profane names. (*Id.* ¶ 34.) Senti Jr. also told Plaintiff that he should "sleep with [his] gun tonight," just hours after a mass shooting at a Pittsburgh synagogue that day.[1] (*Id.*) At a Board of Commissioners meeting later that evening, Senti Jr., in front of Lakeview's Board of Commissioners, also yelled at Plaintiff,

---

[1] The Court takes judicial notice that the mass shooting at the Pittsburgh synagogue occurred on October 27, 2018 and eleven people were killed and six people were injured. *See* Campbell Robertson, Christopher Mele and Sabrina Tavernise, *11 Killed in Synagogue Massacre; Suspect Charged With 29 Counts*, THE NEW YORK TIMES, Oct. 27, 2018, https://www.nytimes.com/2018/10/27/us/active-shooter-pittsburgh-synagogue-shooting.html.

stating, "[a]s a Commissioner I can throw you out of here and you can suck my fucking dick." (*Id*. ¶ 35.)

After Senti Jr. screamed at Plaintiff in front of the Lakeview Board of Commissioners on October 27, 2018, Plaintiff submitted a "Workplace Violence Notification" to then-Chief Sinatro on October 28, 2018. (ECF Nos. 20, AC ¶ 36; 20-4, Exh. 4, Workplace Violence Notification.) Sinatro failed to respond. (*Id*.)

On December 5, 2018, Plaintiff submitted a complaint to the New York State Department of Labor's Public Employee Safety and Health Bureau ("PESH"), alleging the lack of a workplace violence prevention program.[2] (ECF Nos. 20, AC ¶ 37; 20-5, Exh. 5, Notice of Alleged Safety or Health Hazards). Plaintiff asserted violations of 12 NYCRR 800.6(f), 12 NYCRR 800.6(h), and 12 NYCRR 800.6(i). (*Id*.)

**C.   Department of Labor Inspection and Aftermath**

After PESH received Plaintiff's report on January 7, 2019, it conducted an onsite partial safety inspection on January 22, 2019 at the Fire Department's headquarters. (ECF No. 20, AC ¶ 38.) Defendant McNeill participated in the inspection. (*Id*.)

---

[2] The parties also refer to Plaintiff's PESH complaint as an OSHA complaint, but the Court will refer to it as a PESH complaint. (ECF Nos. 20, AC ¶ 73; 20-12, Exh. 12, Facebook Post.) The Court only has record of Plaintiff's complaint to the New York State Department of Labor's Public Employee Safety and Health Bureau (PESH), rather than an additional complaint to the federal counterpart of PESH, U.S. Occupational Safety and Health Administration (OSHA). (ECF Nos. 20, AC ¶ 37; 20-5, Exh. 5, Notice of Alleged Safety or Health Hazards.)

As a result of the investigation, Plaintiff's complaint was sustained and a Notice of Violation and Order to Comply was issued to Lakeview.[3]  (*Id.*)

On February 27, 2019, about a month after PESH's inspection of Lakeview, Defendant Senti Jr. posted a form titled, "Hurt Feelings Report" on four official bulletin boards in the firehouse.  (ECF Nos. 20, ¶ 39; 20-6, Exh. 6, Hurt Feelings Report.)  The "Hurt Feelings Form" form was fashioned to mock a standard complaint form; it stated reasons for filing a complaint that included: "I am a pussy"; "I have woman like hormones"; "I am queer"; and "I am a little bitch."  (ECF No. 20-6, Exh. 6, Hurt Feelings Report.)  The form also included a line to identify the harasser or assailant, styled as "Name of 'Real Man' who hurt your sensitive little feelings" and "Real-man signature: (person being accused)".  (*Id.*)

On May 23, 2019, Defendant McNeill said to Plaintiff, at the monthly firehouse meeting in front of other members of the firehouse, "when you go outside of the organization, we have thrown people out for less."  (ECF No. 20, AC ¶ 40.)  Plaintiff cited this comment as one of the Defendants' many retaliatory threats.

On June 2, 2019, Lakeview issued its first Workplace Violence Statement and Policy.  (*Id.* ¶ 41.)

---

[3] Neither party has submitted PESH's Notice of Violation and Order to Comply (ECF No. 20, AC ¶ 38) or the Workplace Violence Statement and Policy (*id.* ¶ 41).

**D.  FOIL Request and Aftermath**

On July 9, 2019, Plaintiff submitted a New York Freedom of Information Law ("FOIL") request to the Fire District for the Board of Commissioners' meeting minutes, agendas, and financial records for the prior 12 months. (*Id*. ¶ 42.) Senti Jr. provided a copy of the June 2019 financial statement and told Plaintiff that the rest of his request would be forwarded to Lakeview's attorney. (*Id*. ¶ 43.) Plaintiff received no further response to this request. (*Id*.)

On July 10, 2019, Senti III "audited" one of Plaintiff's training sessions by appearing at the location where Plaintiff was training other firefighters, despite Senti III lacking authority to audit Plaintiff's training, and told Plaintiff it was because he had submitted a FOIL request to the Fire District. (*Id*. ¶ 44.) Defendant McNeill did not intervene despite witnessing Senti III's appearance and statement, but Joyce admonished Senti III for this behavior. (*Id*. ¶ 45.)

On July 31, 2019, Senti III "audited" another training course that Plaintiff attended, this time held by Joyce. (*Id*. ¶ 46.) Senti III and Plaintiff interacted with one another at this training culminating in Senti III yelling that he would "love to fuck [Plaintiff] up" and explicitly cited Plaintiff "using the system" and submitting FOIL requests as his reason. (*Id*. ¶¶ 48-

49.)  Defendant Koppel was present during this interaction but did not intervene.  (*Id.* ¶ 50.)

Plaintiff filed a criminal complaint with the Nassau County Police Department in response to the July 31, 2019 incident, during which Senti III expressed his desire to harm Plaintiff. (*Id.* ¶ 51.)  A report was taken by the police, but the police did not follow up. (*Id.*)

On August 1, 2019, Plaintiff submitted a Workplace Violence Incident Report to Defendant Galia regarding Senti III's presence at the July 31, 2019 training.  (ECF No. 20-7, Exh. 7, Workplace Violence Incident Report on August 1, 2019.)("Fred Senti [III] began making comments towards me such as 'such a cunt', 'I'm going to cry because they honked the horn', etc.")  In addition, Plaintiff informed Defendant Galia that "[m]y FOIL request submission is a document that exists between me (a taxpayer) and the fire district (government entity).  This issue has nothing to do with Fred Senti III." (*Id.* at 4.)

### E.   Continued Harassment

On August 4, 2019, Plaintiff was driving to the firehouse when Senti III began following him.  (ECF No. 20, AC ¶ 53.)  In the parking lot, Senti III began cursing and threatening Plaintiff outside of his car.  (*Id.* ¶ 54.)  Fire District Commissioners Defendant Koppel, Defendant McNeill, and non-party Pasquale Rayano ("Rayano") were present and witnessed Senti III's behavior.  (*Id.*)

Defendant Koppel asked Plaintiff to leave so that the others could calm Senti III down.  (*Id.* at ¶ 55.)  Plaintiff did not leave immediately as he needed something from the medical cabinet, so he stayed in the car while Defendant Koppel retrieved the medicine for him.  (*Id.*)

Plaintiff left the firehouse and told his family to stay indoors.  (*Id.* ¶ 56.)  On August 4, 2019, he filed another report with the Nassau County Police Department in response to Senti III's actions, and out of fear that Senti III would follow him home. (*Id.*)

**F.    The Suspension and Resignation from Lieutenant Role**

The next day, on August 5, 2019, Plaintiff was suspended by then-Chief Sinatro for "conduct unbecoming  an officer" due to the August 4, 2019 incident with Senti III.  (*Id.* ¶ 57.)  On August 12, 2019, Plaintiff was afforded a hearing by the Lakeview disciplinary committee, and they found him guilty of "conduct unbecoming [of] an officer" due to the August 4, 2019 incident.[4] (*Id.*)  Plaintiff was suspended for 15 days and was unable to achieve the required length of service award points or required quota to finish the year in good standing.  (*Id.*)

---

[4] It is not clear from the record which individuals the Lakeview disciplinary committee is comprised of and whether any or all of the Individual Defendants, in their official capacities as authorities of the Fire District and Fire Department, might have served on the committee.

On August 12, 2019, Plaintiff wrote Lakeview's records access officer appealing Lakeview's failure to respond to the first FOIL request. (*Id*. ¶ 58.) On October 21, 2019, Plaintiff submitted a second FOIL request, this time, for minutes, agendas, and financial records for the prior sixteen months. (*Id*. ¶ 59.) A week later, Senti Jr. replied with a letter dated July 23, 2019 requesting payment from Plaintiff for the records in his first FOIL request. (*Id*. ¶ 60.)

On November 9, 2019, then-Chief Sinatro told Plaintiff that if Plaintiff did not resign as a Lieutenant, the Individual Defendants would "continue to 'bust [his] balls." (*Id*. ¶ 60.) "Under duress", Plaintiff reluctantly resigned his position as a Lieutenant but remained a member of the Fire Department. (*Id*. ¶ 61.) Plaintiff's resignation letter noted the Defendants' verbal abuse, threats, and harassment and that he could no longer bear the stress in the workplace. (ECF No. 20-8, Exh. 8, Klein Lieutenant Resignation Letter.)

On November 12, 2019, Plaintiff sent two additional letters to Lakeview's records access officer: the first stating that the Fire District's failure to timely respond to his first July 16, 2019 FOIL request constituted a refusal of access; and the second appealing the Fire District's failure to respond to his second October 25, 2019 FOIL request. (ECF No. 20, AC ¶ 62.) Lakeview did not respond to either letter. (*Id*.)

13

The Department also failed to provide Plaintiff with the necessary letter for a tax reduction in real estate and school taxes that Plaintiff earned as a volunteer firefighter, despite Plaintiff's multiple requests.  (*Id.* at ¶ 63.)  The Departments' refusal of the tax reduction letter cost Plaintiff over $1,000 for the 2020 tax year.  (*Id.*)

### G.   Social Media Bullying

In or around May of 2020, non-party EMT Renee Farrell ("Farrell") created a chat (referred to herein as the "Fire Department GroupMe" or "GroupMe") for the Fire Department on GroupMe, an online group chat platform, in which the Fire Department used to post policy updates and disseminate Department information regarding health policy, upcoming Department classes, and scheduling Department training.[5]  (*Id.* ¶ 64.)

On July 29, 2020, as part of the ongoing retaliatory harassment, Defendant McNeill posted on the Fire Department GroupMe chat "Attn LONG ISLAND FF'S PESH IS OUT.  1k fine per non mask wearer.  LOCK YOUR STATON AND BAY DOORS; answer when they ring the bell . . . with your mask on . . . Not for us exclusively

---

[5] The Plaintiff, in his Amended Complaint, refers to messages in the GroupMe chat as an "official message board".  (ECF No. 20, AC ¶ 74.)  The Court will refer to the GroupMe chat or "Fire Department GroupMe" because it was a *de facto* official message board for the Lakeview Fire District and Fire Department as it "disseminate[d] official Department business" including "requesting available members to respond to [Fire Department] incidents."  (*Id.* ¶ 64.)

this time courtesy of . . . ehhh nevermind . . . you ALL know."
(ECF Nos. 20, AC ¶ 65; 20-9, Exh. 9, GroupMe Chat Screenshot.)

Later that same day, Senti III posted a series of messages on the Fire Department GroupMe that appeared to refer to Plaintiff's first name Yonathan or "Yoni" for short. Senti III provided a screenshot of a Wikipedia page defining the word "Yoni" as "womb" in Sanskrit. (ECF Nos. 20, AC ¶ 69.) The Wikipedia page highlighted that the word may connote female sexual organs such as "vagina." (*Id.* at ¶ 67.) Senti III added:

> "Etymology of names is cool"
> "Who knew it really meant that and I was right all along"
> "Fuck it, time for fireworks I wouldn't be me if it wasn't 🤣🤣🤣🤣."

(ECF Nos. 20, AC ¶ 66; 20-9, Exh. 9, GroupMe Chat Screenshot.) Senti III's post also stated, "Not a coincidence," and "Blame Wikipedia and your mom not me." (*Id.*) Plaintiff then posted a GroupMe message saying "Thank you," to which Senti III replied "Your [sic] welcome," and "Now I see you were just living up to your name all along!" (*Id.*)

That same day Senti III posted more messages in the GroupMe chat saying, "I found something that you might find interesting though" and "[i]t literally explains everything." (ECF No. 20-11, Exh. 11, GroupMe Chat Screenshot 2.) He then asked "[w]hat do you think should I share my findings." (*Id.*) Defendant McNeill responded in the GroupMe chat, "Now now . . . there will

be a lot of paperwork if you do.  Letters, tissues, crying . . ."
(*Id.*)  Senti III then said, "Isn't there always anyway?  Mostly
manufactured lies."  (*Id.*)

On August 11, 2020, Defendant Galia posted a photograph
on Facebook depicting a fire truck ladder basket raised and
extended next to a telephone pole with a hand ladder inside it
leaning against the telephone pole.  (ECF No. 20-12, Exh. 12,
Facebook Post.)  Text on this photograph states, "SOMEWHERE AN
OSHA MANUAL JUST BURST INTO FLAMES," appearing to refer to
Plaintiff's complaint to PESH.  (*Id.*)  Defendant McNeill commented
on Defendant Galia's post, "Watch out for those violations.
Falsified or not." (*Id.*)

On August 12, 2020, Defendant Galia emailed Plaintiff
stating that after a meeting of the Board of Fire Commissioners
the previous night, Galia was "tasked" with requesting from
Plaintiff (i) access to the safe program, (ii) return of the 2018
recertification paperwork, (iii) the login and password to
Lakeview's website.  (ECF No. 20, AC ¶ 70.)  Plaintiff responded
that he did not have access to the safe or re-certification
paperwork and asked whether he was being terminated as the Fire
Department's webmaster.  (*Id.* ¶ 71.)  The record does not reflect
whether Defendant Galia responded.

On August 13, 2020, in the Fire Department's GroupMe
chat, Senti III sent a message: "By removing him now he can't see

all the fun and cool stuff he's missing . . ." (ECF No. 20-13, Exh. 13, GroupMe Chat Screenshot 3.)  Defendant McNeill responded in the GroupMe, "I'm good with ridding the useless.  The board's attorney has given the go ahead of swamp draining.  Gotta go . . ." (*Id.*)  Immediately following this message, Defendant Koppel wrote, "Teamwork baby, families fight but they always end up righting their mistakes not writing letters or filing false police reports." (*Id.*)  Senti III responded, "Amen." (*Id.*)

Shortly after this GroupMe exchange between the three defendants on the Fire Department GroupMe, the Plaintiff and three others were removed from the GroupMe chat by Defendant McNeill. (ECF No. 20-14, Exh. 14, GroupMe Chat Screenshot 4.)  Immediately after the removals, Defendant McNeill stated to the rest of the group, "Write another letter." (*Id.*)

On August 17, 2020, Defendant Koppel emailed Plaintiff advising him that after discussion with the Board of Fire Commissioners and the Chiefs, Plaintiff was terminated as Lakeview's narcotics agent. (ECF No. 20, AC ¶¶ 76-77.)  Plaintiff had emailed Defendant Koppel on August 16, 2020, advising that controlled substances needed to be ordered and that the Fire Department's benzodiazepine supply was expiring. (*Id.*)

At some point Plaintiff was added back to the Fire Department GroupMe but was then removed again from the GroupMe chat on October 4, 2020, this time by Farrell. (*Id.* ¶ 78.)  After

the removal, Farrell privately messaged Plaintiff stating, "I was asked to remove you from the group due to the fact that you have no quota and no responses on calls, that's exactly what I was told so I'm just letting you know sorry." (ECF Nos. 20 AC, ¶ 78; 20-15, Exh. 15, Farrell Screenshot.)

In response to his removal from the Fire Department GroupMe, Plaintiff complained to Defendant Galia who informed him that "Groupme is not under my jurisdiction . . . because they are not sanctioned by the district or department . . . [it's] just a group of friends with a common interest . . ." (*Id.* ¶ 79; ECF No. 20-16, Exh. 16, Galia Screenshot.) Galia also wrote, "In regards to [Senti III] showing up to your house [on August 13, after Senti III followed Plaintiff home, rolled down his window and yelled at Plaintiff] . . . I am told that since he was not on district property, operating a district vehicle and not sent there to talk to you by his superiors that is a private matter." (*Id.*)[6]

According to the Department's official social media policy, issued on February 14, 2017, "[e]mployees should use their best judgement in not posting material that is inappropriate nor harmful to Lakeview Fire Department and/or Lakeview Fire District, its employees, or civilians of the District." (ECF No. 20-17,

---

[6] The Court notes that Plaintiff previously reported that Senti Jr. has driven by Plaintiff's home in a district vehicle (ECF No. 20-2, Klein Memorandum), even if his son, Senti III, did not during the incident referenced by Galia in this message.

Exh. 17, Lakeview Social Media Policy.)  The social media policy goes on to list "commentary, content, or images that are defamatory, pornographic, proprietary, harassing, libelous, under criminal/open investigations, or that can create a hostile work environment" as examples of content that employees are not to publish. (*Id.*)

### H.   The Termination

By letter dated January 12, 2021, Defendant Galia terminated Plaintiff as a Lakeview volunteer firefighter, citing the Fire Department's bylaws and that Plaintiff had not maintained his quota of meeting attendance and trainings.  (ECF Nos. 20, AC ¶¶ 81-82; 20-18, Exh. 18, Termination Letter.)  The termination letter explained that Plaintiff was asked to speak to the officers of the Fire Department in order to discuss his purported failure to meet the attendance and training quota, but that Plaintiff did not schedule the meeting.  (ECF No. 20-18, Termination Letter.) Plaintiff does not state if he complied with the request that he speak with Fire Department officers regarding his failure to meet the quota, but alleges there was a "pervasive and hostile environment created by Defendants" and that he felt that he was "constructively prevented from fulfilling his duties out of a legitimate fear for his physical safety." (*Id.* ¶¶ 82-83.)

Defendants' basis for terminating Plaintiff was a sham and its quota policy was selectively enforced against Plaintiff.

(*Id.* ¶ 83.)   At the Fire Department, in 2019, 58 volunteers, comprising 56% of the Fire Department volunteers, had lower attendance than Plaintiff.  (ECF Nos. 20, AC ¶¶ 83-85; 20-19, Exh. 19, 2019 Quota Report.)  In 2020, nearly 22% of the volunteer force had an attendance rate lower than Plaintiff's.  (ECF Nos. 20, AC ¶¶ 83-85; 20-20, Exh. 20, 2020 Quota Report 2.)

In further retaliation by Defendants, Plaintiff was terminated from the Fire District Benevolent Association's Insurance Program four days after he filed his complaint against Defendants in this Court.  (ECF Nos. 20, AC ¶¶ 86-93; 20-21, Exh. 21, Insurance Company Letter.)  Plaintiff discovered he had been terminated from the Insurance Program after receiving a letter from the insurance company stating that he would no longer be receiving benefits from the Fire District.  (*Id.*)

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Although "detailed factual allegations" are not required, "[a] pleading

that offers labels or conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (quotation omitted).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit or matters of which judicial notice may be taken. S*ee Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002); *see also Estevez v. City of New York*, No. 16-cv-00073, 2017 WL 1167379, at *1-2 (S.D.N.Y. Mar. 28, 2017).

## DISCUSSION

Defendants contend that Plaintiff has failed to plead viable constitutional claims to support an action under 42 U.S.C. § 1983. The Court disagrees. Plaintiff has pleaded abundant facts to state a plausible First Amendment retaliation claim and Fourteenth Amendment Due Process claim. The Court respectfully rejects the Defendants' qualified immunity arguments and Lakeview's arguments against *Monell* liability.

## I.   42 U.S.C. § 1983

To maintain a section 1983 action, Plaintiff must allege two elements. First, "the conduct complained of must have been committed by a person acting under color of state law." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citation omitted).

The Plaintiff sufficiently alleged that Defendants acted under color of state law.  Second, "the conduct complained of must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Id*.  Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist*., 423 F.3d 153, 159 (2d Cir. 2005) (citing *Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)).  The Court address Defendants' alleged violations of Plaintiff's First and Fourteenth Amendment rights.

## A. First Amendment Retaliation Claim

The Court concludes that Plaintiff has alleged a plausible First Amendment retaliation claim against all of the Defendants.  "[W]hile the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001).  A public employee may establish a First Amendment retaliation claim against his governmental employer "that: (1) his or her speech was constitutionally protected; (2) he or she suffered an adverse employment action; and (3) a causal connection exists between the speech and the adverse employment action." *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004).

## 1. Protected Speech

The First Amendment protects a public employee's speech only when it is "made as a citizen on matters of public concern rather than as an employee on matters of personal interest." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (quotation omitted). "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.

In the Amended Complaint, the Court finds numerous and sufficiently pleaded examples of Plaintiff's speech on matters of public concern. *Connick*, 461 U.S. at 147–48. On October 27, 2018, after Senti Jr., a Fire District Commissioner, threatened Plaintiff at a Board of Commissioners meeting, Plaintiff filed a workplace violence notification to Fire Department authorities; on December 5, 2018, Plaintiff filed with the New York Department of Labor a PESH complaint that Lakeview lacked a workplace violence prevention program; and on July 9, 2019 and October 21, 2019, Plaintiff filed FOIL requests seeking Board of Commissioner meeting minutes, agendas, and financial records. (ECF No. 20, AC ¶¶ 36–37, 42, 59.)

The precipitating event for Defendants' First Amendment violations of Plaintiff's rights was the Plaintiff's intervention in attempting to stop the 2017 assault by Senti III on Ackerman, and Plaintiff's advice to Ackerman that it would be appropriate to report Senti III's assault to the police. (*Id.* ¶ 19.) Thereafter, Defendants continually referenced Plaintiff's intervention in their written and verbal threats against Plaintiff and other Fire Department members, retaliating after Plaintiff supported Ackerman after Senti III's assault. (Id. ¶ 21.) Defendants negatively reacted to Plaintiff's reporting of workplace violence. (ECF Nos. 20-2, Exh. 2, Klein Memorandum ("Since the suspension of Fred Senti III, Commissioner Fred Senti Jr. has been engaging in harassment and creating a hostile work environment."); 20-1, Exh. 1, Wein Memorandum (detailing how Defendant Senti Jr. mentioned "he would continue to harass [Plaintiff and Wein] until the day we leave the department.").) Reporting instances of assault by employees of a government agency, especially when the assault is perpetrated by a public official with a supervisory or leadership position in the presence of other public employees, falls well within the realm of matters of public concern.

Following multiple events of threats by Defendants Senti Jr. and Senti III against Plaintiff and other volunteer firefighters with whom they engaged in additional physical and verbal altercations, Plaintiff also reported various examples of

workplace violence or harassment that not only related to his own experiences, but the experience of other Fire Department employees as well. (ECF Nos. 20-1, Exh. 1, Klein Memorandum ("On 11/29/2017, Commissioner Fred Senti Jr. told [non-party Wein] that he would arrange for someone to kick Firefighter Ryan Ackerman and [Plaintiff] down the stairs in a fire."; 20-5, Exh. 5, Notice of Alleged Safety or Health Hazards ("[Ex-Chief Frederick Senti III and Commissioner Fred Senti Jr.] have both directly threatened the safety of [Fire Department] members.").) Matters of workplace safety, particularly involving firefighters who are undertaking physical risks when performing their duties to protect the public, are no doubt matters of concern to the public, which funds the Fire Department.

The fact that other firefighters spoke out and were threatened or assaulted and that the Individual Defendants were aware of the abuse, underscores that the workplace incidents at Lakeview had a broader, public component. Fellow Fire Department member Wein also sent a memorandum detailing the behavior of Defendant Senti III to Defendant Galia, the Captain and Assistant Chief of the Fire Department at the time. (ECF Nos. 20, AC ¶¶ 25-28; 20-1, Exh. 1, Wein Memorandum ("[Senti III] went on to make a not so veiled threat against [Plaintiff] and [another member] telling me how 'people can just fall downstairs during fires' and it would just seem like an accident because accidents happen during

fires.").)   Reports by Wein and Plaintiff of threats by high-ranking officials of the Fire Department, including threats of physical assault while performing firefighting duties, provide context as instructed by the Supreme Court in *Connick* in considering whether speech by firefighters Wein and Plaintiff, embodied in their memoranda to Captain and Assistant Chief Galia, was of a purely personal nature, or whether it addressed matters of concern to the community.

Defendants argue that Plaintiff's exercise of speech was "merely calculated to redress personal grievances," but this Court disagrees.  *See MacFall v. City of Rochester*, 495 F. App'x 158, 160 (2d Cir. 2012) (quotation omitted).  As an initial matter, in considering a 12(b)(6) motion, the Court must accept as true the well-pleaded facts alleged in the Amended Complaint.

Considering "the content, form, and context" of Plaintiff's speech, "as revealed by the whole record," this Court finds that Plaintiff's speech is not solely about a personal grievance and but about matters of public concern including pervasive violent threats and workplace abuses by supervisory officials of a public entity charged with protecting the public safety.  The supervisory Individual Defendants, paid by the public, allegedly used their authority to threaten members of the Fire Department for truthfully reporting assaults and threats by supervisors, including a threat to hurt members of the Fire

Department while fighting a fire and harassing them until they left. *Connick*, 461 U.S. at 147–48; *Pekowsky v. Yonkers Bd. of Educ.*, 23 F. Supp. 3d 269, 276–77 (S.D.N.Y. 2014) ("A 'matter of public concern' is one that 'relates to any matter of political, social, or other concern to the community.'" (quoting *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013))); *see also Magilton v. Tocco*, 379 F. Supp. 2d 495, 500 (S.D.N.Y. 2005) (assuming that an employee's complaints to PESH regarding his State employer's poor workplace safety practices were a matter of public concern and triggered First Amendment protections). Furthermore, even if Plaintiff's internal reports and the New York Department of Labor PESH complaint were later motivated, in part, by Plaintiff's personal concerns for his safety, the Second Circuit has found that "[a] speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern . . . [and] it does not follow that a person motivated by a personal grievance cannot be speaking on a matter of public concern." *Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009).

Defendants further argue that a court in this District found in *Gustler*, that the filing of workplace violence reports and the PESH complaint did not amount to speech protected under the First Amendment because they "concerned Plaintiff's personality conflict with a co-worker and Plaintiff's ability to continue to work with that individual." (ECF No. 27, Mot. to

Dismiss at 12.)  Unlike the *Gustler* case, the Individual Defendants were not co-workers, but were supervisors with authority whose threats and abuse were frequently perpetrated in front of other employees.  Based on the Plaintiff's well-pleaded allegations, the Court does not agree that the Defendants' pervasive and systemic harassment of Plaintiff and other Lakeview firefighters could plausibly be a mere personality disagreement with Plaintiff.  In any event, Defendants' analysis of the *Gustler* opinion is incomplete.  The court in *Gustler* found that Plaintiff's speech *was* protected under the First Amendment, because he went to the police department about the same incidents that he reported on internally.  The *Gustler* court stated that the complaints about an intoxicated firefighter to the police department was the "right of every citizen" and "dealt directly with matters of public safety." *Gustler* at 128 (E.D.N.Y. 2011).  In the present case, Plaintiff similarly twice reported the supervising Individual Defendants' threats of violence and abuse to the Nassau County Police Department, notwithstanding that he first reported the same incidents internally.  (ECF No. 20, AC ¶¶ 51, 56).  Even if Plaintiff's internal workplace violence reports and PESH complaint are not protected speech, the Court nonetheless concludes that his reports to the Nassau County police were protected speech.

In addition to Plaintiff's speech regarding the Individual Defendants' workplace violence, threats, and harassment

at Lakeview, Plaintiff's First Amendment claim has another viable basis.   Plaintiff submitted FOIL requests for the Board of Commissioners meeting minutes, agendas, and financial records after he, as a taxpayer, suspected official vehicles were being used for unofficial business.  (ECF No. 20, AC ¶¶ 42, 48, 59.)  As one of Plaintiff's workplace violence incident reports even explained, "[m]y FOIL request submission is a document that exists between me (a taxpayer) and the fire district (government entity). This issue has nothing to do with Fred Senti III."  (ECF No. 20-7, Exh. 7, Workplace Violence Incident Report on August 1, 2019 at 4.)  Plaintiff's concern regarding misuse of official vehicles during non-duty hours was based, in part, on his own observations and experience, including an incident where Senti III drove to Plaintiff's home late in the evening, activated a siren, awakened Plaintiff's children.  (ECF No. 20, AC ¶¶ 41-48.)  Plaintiff's requests for information from public entities on how they are utilizing, monitoring, and spending their publicly funded resources constitutes citizen speech on matters of public interest and is wholly within the realm of public concern.  *See McAvey v. Orange-Ulster BOCES*, 805 F. Supp. 2d 30, 39-40 (S.D.N.Y. 2011) (finding that FOIL requests by a citizen are considered protected speech).  The numerous instances of retaliation to which Plaintiff was subjected after filing FOIL requests provided additional bases for Plaintiff's First Amendment claim.

Significantly, Defendants do not contend—and thus have forfeited for purposes of their motion—that Lakeview had firefighting interests that conclusively outweigh Plaintiff's First Amendment speech interests.  If a public employee speaks as a citizen on a matter of public concern, whether her speech is protected by the First Amendment must also be evaluated under the so-called *Pickering* analysis, which considers "whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  In conducting this analysis, courts look to whether an employer could reasonably predict that the employee's speech would cause a disruption serious enough to outweigh the value of the speech to matters of public concern, and whether the potential disruption was the motivation of the adverse action.  *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011); *see also Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 298 (E.D.N.Y. 2009) (explaining that the *Pickering* analysis is "fact-intensive").

Defendants, however, offer no justifications for their actions against Plaintiff, and do not argue that any governmental need as an employer outweighed Plaintiff's exercise of his speech rights, or that his speech was disruptive. At least at this stage, it is plausible that Defendants' threatening, harassing, and

retaliatory actions did not arise from any valid governmental interest and that Plaintiff's speech was protected and caused no disruption to the Department's functions.  Accordingly, the Court determines that Plaintiff has plausibly alleged that his speech was protected by the First Amendment and that Defendants violated his rights.

### 2. Adverse Employment Action

"In the context of a First Amendment retaliation claim, [the Second Circuit has] held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225–26 (2d Cir. 2006) (quotation and alteration omitted).  Under this standard, "adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Id*. at 226.  Even "lesser actions" such as negative reviews, false accusations, and menial job assignments may also be considered adverse employment actions." *Id*.; *see also Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).  Finally, while *de minimis* incidents alone will not give rise to a First Amendment retaliation claim, "a combination of seemingly minor incidents [may] form the basis of a constitutional retaliation claim once they reach a critical mass" and create "a working environment

unreasonably inferior to what would be considered normal for that position." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).

Plaintiff's Amended Complaint paints a detailed picture in which Plaintiff has been subjected to a sustained, systematic course of verbal harassment, physical and verbal threats, ostracism, demotion, termination, and demeaning insults intended, as Defendants' statements reveal, to drive him out of the Lakeview Fire Department.  Each of the Individual Defendants, all of whom held previous or current roles of leadership, directly took part in, witnessed, or failed to stop the Defendants' behavior.  For example, the Amended Complaint alleges that Defendant Senti III told Plaintiff that he would make Plaintiff's life at work difficult and "that [it was] a promise."  (ECF No. 20, AC ¶ 24.) Defendants arbitrarily audited Plaintiff's training sessions, while explicitly citing Plaintiff "using the system" and submitting FOIL requests as reasons for auditing Plaintiff.  (*Id.* ¶¶ 44-49.)  Defendants would drive back and forth or park outside the Plaintiff's home in official Fire District vehicles or their personal vehicles and on at least one occasion, blaring a siren late in the evening and awakening Plaintiff's children.  (*Id.* ¶ 23.)  Defendants posted mock complaint forms on official firehouse bulletin boards disparaging anyone who would bring a complaint. (*Id.* ¶ 39.)  Defendant Senti Jr. yelled outside of a Lakeview Board

of Commissioner's meeting: "[a]s a Commissioner I can throw you out of here and you can suck my fucking dick."  (*Id.* ¶ 35.)

Defendants' actions are sufficient to plausibly state an adverse employment action under a "critical mass" theory.  *See Phillips*, 278 F.3d at 109; *see also Zelnik*, 464 F.3d at 226. Moreover, Defendants abusive conduct often occurred in front of both non-supervisory and supervisory members of the Fire Department which conduct would plausibly deter others from exercising their constitutional rights.  The Amended Complaint alleges that Plaintiff was asked to "voluntarily" step down as a Lieutenant—with the Chief of the firehouse expressly stating that Defendants would continue to "bust his balls" if he did not.  (*Id.* at ¶ 61.)  Plaintiff was stripped of his webmaster duties and his duties involving the Fire Department's medications.  (*Id.* ¶¶ 71, 77.)  Finally, Plaintiff was ultimately terminated by the Fire District for failing to meet an apparent quota that numerous other firefighters did not meet, as shown in the Fire Department records. (*Id.* at ¶¶ 82, 84-85.)  As demotion and termination qualify as adverse employment actions, *see Zelnik*, 464 F.3d at 225, Plaintiff has plausibly alleged an adverse employment action.

### 3. Causation

The last category of plausible facts which must be alleged for a Plaintiff to establish a First Amendment retaliation claim is a causal relationship between the protected speech and

the adverse employment action.  "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris*, 196 F.3d at 110 (citation omitted).  "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Id.* (citation omitted).  Furthermore, "[w]ith respect to the "causal connection" requirement, a plaintiff must plead facts from which it can be reasonable be inferred that the defendant was aware of the purportedly protected speech. *Wrobel v. Cnty. Of Erie*, 692 F.3d 22, 32 (2d Cir. 2012).

Here, Plaintiff alleges numerous adverse actions occurring after his initial report of Senti III's physical altercation, including Plaintiff's termination on January 12, 2021. (ECF No. 20, AC ¶¶ 21-24, 26, 30, 33-35, 39-40, 44-49, 61, 67-68, 75, 81-82, 92.)  The allegations in the Amended Complaint allege that Defendants were also aware of, or at least suspected, that the Plaintiff had filed the workplace violence reports, PESH complaint, Nassau County police reports, and the FOIL requests, and that the Defendants' relentless and systematic course of harassment was the direct result of Defendants' knowledge or

suspicion regarding Plaintiff's exercise of his First Amendment rights.  Plaintiff alleges that Defendants themselves referenced to Plaintiff's exercise of his rights when Individual Defendants threatened and harassed him.  For example, on February 27, 2019, a few weeks after Lakeview received word of the PESH complaint, Senti Jr. posted a form titled, "Hurt Feelings Report" on four official bulletin boards in the firehouse.  (ECF No. 20, AC ¶ 39; ECF No. 20-6, Exh. 6.)  On May 23, 2019, Defendant McNeill said to Plaintiff, at the monthly firehouse meeting in front of witnesses, "when you go outside of the organization, we have thrown people out for less." (*Id.* ¶ 40.)  On November 9, 2019, a few weeks after Plaintiff submitted his second FOIL request, then-Chief Sinatro said if Plaintiff did not resign as a Lieutenant, Individual Defendants would "continue to 'bust [his] balls.'" (*Id.* at ¶ 60.)

The Court also finds the Individual Defendants' social media comments to be probative of the causal link between Defendants' retaliatory conduct in response to Plaintiff's speech. On August 11, 2020, Defendant McNeill mocked Plaintiff's complaint to the Department of Labor when she posted on Facebook, "[w]atch out for those violations.  Falsified or not." (*Id.* ¶ 73.)  On August 13, 2020, Defendant Senti III spoke of removing Plaintiff from the Fire Department GroupMe, so he would "see all the fun and cool stuff he's missing" and Defendant McNeill responded, "I'm so good with ridding the useless.  The board's attorney has given the

go ahead of swamp draining." (*Id.* ¶ 73-74.) Defendant Koppel responded on the Fire Department GroupMe, "Teamwork baby, families fight but they always end up righting their mistakes not writing letters or filing false police reports." (*Id.*) Defendant Senti III followed with, "Amen." (*Id.*) Shortly after this exchange between Individual Defendants McNeill, Koppel, and Senti III on the Fire Department GroupMe, the Plaintiff and three others were removed from the GroupMe chat by Defendant McNeill. (*Id.* at ¶ 75; ECF No. 20-14 Exh. 14, GroupMe Chat Screenshot 4.) Immediately after the removals, Defendant McNeill appeared to warn the rest of the group, "Write another letter." (*Id.*) Accordingly, based on Defendants' admissions to Plaintiff that they intended to drive him out of the Fire Department under threats of physical harm, and Defendants' written posts and emails, Plaintiff has plausibly alleged that Defendants' adverse actions were motivated by retaliatory animus.

### B. Fourteenth Amendment

The Plaintiff contends that the City deprived him of his Fourteenth Amendment procedural due process rights.[7] To prevail

---

[7] Plaintiff alleged a Fifth Amendment claim in his complaint (ECF No. 20, AC ¶¶ 4, 6), but he did not defend, much less mention, any basis for his Fifth Amendment claim in his opposition to Defendants' motion to dismiss. The Court treats Plaintiff's failure as an abandonment of his Fifth Amendment claim and dismisses Plaintiff's Fifth Amendment claim because Defendants correctly note that the Fifth Amendment claim only applies to federal actors, and here, the Defendants are state actors. *Sylla v. City of New York*, 04-cv-5692, 2005 WL 3336460, at * 2 (E.D.N.Y. Dec.8, 2005) ("The Fifth Amendment is applicable only to the federal government."); citing *Public Utilities Comm'n of Dist. of*

on this claim, the Plaintiff must show that he "possessed a protected liberty or property interest, and that he was deprived of that interest without due process." *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998) (per curiam); *see Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005). When a public employee is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterward." *Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985)).

Property interests are not created by the Constitution, but "'stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Ciambriello*, 292 F.3d at 313 (quoting B*oard of Regents v. Roth*, 408 U.S. 564, 577 (1972)). To state a due process claim, a "plaintiff must have a property interest in a benefit that is 'more than an abstract need or desire for it. [He] must instead have a legitimate claim of entitlement to it' under state or federal law." *Finley v. Giacobbe*, 79 F.3d 1285, 1296 (2d Cir.1996) (quoting *Roth*, 408 U.S. at 577).

---

*Columbia v. Pollak*, 343 U.S. 451, 461 (1952); *see also LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995)(appellants can be deemed to have abandoned issues they fail to raise before the district court).

First, Plaintiff alleges he was deprived of a proper pre-termination hearing before he was issued a termination letter on January 12, 2021, dismissing him as a volunteer member of Lakeview. (*Id.* ¶ 81.) The parties do not dispute and it is well-settled that in New York, "volunteer firefighters are considered public employees and must be afforded due process in disciplinary proceedings," which includes the right to a hearing held upon due notice and upon stated charges. *Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint Fire Dist.*, 178 F. Supp. 3d 118, 139 (S.D.N.Y. 2016); *Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 610 (E.D.N.Y. 2011).

When a volunteer firefighter is terminated, the law is clear that "procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." *Locurto*, 264 F.3d 154, 171 (2d Cir. 2001) (citation omitted). "The pre-termination process 'need not be elaborate' or approach the level of a 'full adversarial evidentiary hearing,' but due process does require that before being terminated such an 'employee [be given] oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.'" *Otero v. Bridgeport Housing Auth.*, 297 F.3d 142, 151 (2d Cir. 2002) (quoting *Loudermill*, 470 U.S. at 545, 546).

Assuming Plaintiff's allegations to be true, and drawing inferences in favor of the Plaintiff, the Court finds that Plaintiff plausibly alleged that Defendants did not provide him a pre-termination hearing with respect to the termination of his volunteer position at Lakeview.  On January 12, 2021, Defendant Galia notified Plaintiff that he had "been relieved of [his] duties as a member of the Lakeview Fire Department", referencing the Department's bylaws and that Plaintiff had not maintained his quota of meeting attendance and trainings.  (ECF No. 20, AC ¶ 82; ECF No. 20-18, Exh. 18.)  The termination letter to Plaintiff specifically stated: "Furthermore, a letter was sent to your house requesting you to discuss your failure to maintain a quota with the officers.  The Captain told you that you needed to schedule a meeting with the officers and to this date you have not scheduled that meeting."  (*Id*.)

Defendants thus assert that they adequately provided "an opportunity to be heard by offering to meet to discuss the matter with [Plaintiff] before he was relieved of his duties" (ECF No. 27, Mot. to Dismiss at 15),  but the Court cannot conclude that the request to meet was a proper "opportunity to present [Plaintiff's] side of the story," nor can the Court discern whether Plaintiff had notice that he would be terminated if he failed to schedule a meeting. *Loudermill*, 470 U.S. at 546.  Moreover, the aforementioned letter to Plaintiff in which Defendant Galia

terminated Plaintiff is not attached to the Amended Complaint, so the Court cannot conclude that the scheduling letter Defendant Galia references actually provided "notice of the charges against Plaintiff" and "an explanation of the employer's evidence" to Plaintiff. *Id.* Thus, the Court finds that Plaintiff was not provided the limited, but nonetheless requisite, pre-termination hearing before the termination of his employment at Lakeview Fire Department.[8]

In addition to the loss of his salary, Plaintiff alleges deprivations of additional property interests. Any Lakeview member in good standing for over five years, as was Plaintiff, automatically becomes a member of the Fire District Benevolent Association for Life and is entitled to receive, *inter alia*, insurance coverage providing disability benefits. (ECF No. 20, AC ¶¶ 86-87, 90.) Plaintiff pleads sufficient facts that plausibly establish that the Benevolent Association benefit is provided for by state and county laws. (*Id.* ¶ 87.) Plaintiff had qualified for benefits as a member of the Fire District's Benevolent Association for Life and was a member of the Fire Department in

---

[8] Because the Court finds that Plaintiff sufficiently alleged the lack of a pre-termination hearing, the Court need not address whether Plaintiff was afforded or sought a post-termination hearing. *See Gilbert v. Homar*, 520 U.S. 924, 929 (1997)("[A] public employee dismissible only for cause was entitled to a very limited hearing *prior* to his termination, to be followed by a more comprehensive post-termination hearing.") Notwithstanding the absence of a pre-termination hearing, the Court finds that "[a]n Article 78 proceeding. . . constitutes a wholly adequate post-deprivation hearing for due process purposes." *Locurto v. Safir*, 264 F.3d 154, 175 (2d Cir. 2001).

good standing for over five years, entitling him to receive insurance coverage providing disability benefits. (*Id.* ¶¶ 88-89.)

The Second Circuit has recognized that public employees have a "property" right to certain disability retirement and pension benefits. *See Russel v. Dunston*, 896 F.2d 664, 668-69 (2d Cir. 1990) (holding that state disability retirement benefits are a constitutionally protected property interest); *Winston v. City of New York*, 759 F.2d 242, 247-49 (2d Cir. 1985) (holding that municipal employee retirement benefits are protected); *Basciano v. Herkimer*, 605 F.2d 605 (2d Cir. 1978) (finding that denial of the entire basic retirement benefit was a deprivation subject to due process protection); *see also Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332 (E.D.N.Y. 2009) (finding that the refusal to pay an employee any disability retirement benefits was a deprivation of a protected property interest).

On March 24, 2021, four days after Plaintiff commenced the instant action on March 19, 2021, Plaintiff was terminated, without notice, from the Fire District's Benevolent Association's insurance program. (*Id.* at ¶ 92.) Defendants Senti Jr. and McNeill were allegedly voting members of Lakeview's Benevolent Association at the time of termination. (*Id.* at ¶ 93.) Plaintiff only found out his Fire District's Benevolent Association insurance was terminated by a letter from the insurance company.

(ECF No. 20-21, Exh. 21) ("We recently learned that your premiums will no longer be paid through VOLUNTEER FIREARMS BENEVOLENT.")

Defendants argue that because the Benevolent Association is a separate entity from Lakeview and because it is not a party to this action, there can be no basis "to impute its alleged acts onto Defendants." (ECF No. 29, Def. Reply at 9.) The Court disagrees, noting that because Defendants Senti Jr. and McNeill were voting board members of the Benevolent Association, Plaintiff has sufficiently plead facts that Defendants Senti Jr. and McNeill may be held accountable for any improper termination of benefits from the Benevolent Association without due process. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.")

The Court thus finds that Plaintiff possessed protected property interests in his employment as a Lakeview firefighter and his Fire District's Benevolent Association disability insurance coverage, and that he has alleged sufficient facts to state a claim for deprivation of those interests without due process.

### C. Qualified Immunity

Defendants assert that the Individual Defendants are shielded from liability by the doctrine of qualified immunity. This Court disagrees.

For any alleged violation, the qualified immunity analysis proceeds in two parts. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)). The second part of the qualified immunity analysis requires the Court to consider "whether [the] right is clearly established"— i.e., "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right…and that in light of pre-existing law the unlawfulness must be apparent."). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v. Suffolk Cnty., New York*, 17 F.4th 342, 367 (2d Cir. 2021) (citing *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)). Defendants correctly note that the doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, (2011); *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As discussed, *supra*, accepting the Plaintiff's well-pleaded factual allegations as true, this Court concludes that Plaintiff has plausibly alleged that the Individual Defendants violated Plaintiff's First and Fourteenth Amendment rights, and are not shielded by the qualified immunity doctrine in the present case.

First, as to his First Amendment retaliation claim, Plaintiff plausibly alleged that Defendants constantly and repeatedly threatened physical violence and harassed him for his reports to the police and New York Department of Labor, his workplace incident reports, and his FOIL requests. As the Court explained above, Plaintiff's police reports, as well as his FOIL requests and workplace incident reports are protected by the First Amendment. *See Connick*, 461 U.S. 138, 146 (1983) ("Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'") Notwithstanding the internal workplace reports, Defendants engaged in ongoing and pervasive retaliation for Plaintiff's police reports, and there is no question under existing law that the First Amendment protects an individual's right to speak out or report to the police about assaults and other misconduct by an individual or within a government entity. *See, e.g., San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam) ("Were [public employees] not able to speak on [the operation of their

employers], the community would be deprived of informed opinions on important public issues.  The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it"  (citation omitted)); *cf. United States v. Treasury Employees*, 513 U.S. 454, 470 (1995) ("The large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said"); *see also Gustler*, 823 F. Supp. 2d 98, 125 (2011) (finding plaintiff's report to police about the organization's misconduct was protected).  Furthermore, Defendants miss the mark by arguing that Plaintiff does not have a right to file FOIL requests under the First Amendment.  Plaintiff's First Amendment right protects him from being retaliated against for filing FOIL requests and for appealing those requests.  All in all, the Individual Defendants' protracted campaign of threats and harassment against Plaintiff falls well outside the bounds of what was or should be clear to a reasonable official regarding the First Amendment.  Plaintiff has plausibly alleged facts that reasonable public officials knew or should have known to refrain from engaging in abusive, harassing, and threatening conduct.

Second, Defendants knew or should have known to provide notice and an opportunity to be heard prior to terminating Plaintiff's employment and insurance disability benefits to which

Plaintiff was entitled by law and had already been receiving. It is well-established that employment and insurance benefits are forms of property, and that pre-termination process would be required under the Fourteen Amendment right to due process. *See Ratajack,* 178 F. Supp. 3d 118, 139 (S.D.N.Y. 2016)("volunteer firefighters are considered public employees and must be afforded due process in disciplinary proceedings"); *see also Russel*, 896 F.2d 664, 668-69 (2d Cir. 1990) (holding that state disability retirement benefits are a constitutionally protected property interest).

Finally, with respect to all of the constitutional claims, Defendants argue that some Individual Defendants should be dismissed because each was not personally involved in each constitutional violation. The Court reads the complaint differently. Defendants Senti. Jr, Senti III, Koppel, Galia, and McNeill were all supervisors and/or held positions of authority, (Captains, Chiefs, Commissioners) and either actively participated in the retaliation and threats because of Plaintiff's exercise of his free speech rights or stood by and witnessed the Defendants' egregious behavior without intervening or were made aware of the conduct through complaints by Plaintiff and other employees. (ECF No. 20, AC ¶¶ 21-24, 26, 30, 33-35, 39-40, 44-49, 61, 67-68, 75, 81-82, 92.) Defendant Galia issued a letter relieving Plaintiff of his employment without a pre-deprivation hearing. (*Id*. ¶ 81.)

Defendants Senti Jr. and McNeill were voting members of the board overseeing Plaintiff's insurance coverage at the time of termination of the benefits and could have provided notice but did not. (*Id.* ¶ 88.)   There is, therefore, no basis to dismiss the Individual Defendants on the basis of qualified immunity.   The Court further notes that Senti Jr., Senti III, and McNeil and her husband, Patrick McNeill, were related by blood or marriage and used their positions of authority to violate Plaintiff's constitutional rights, after Senti III's physical assault of another Fire Department employee who was subsequently supported by Plaintiff.

### D. *Monell* **Liability as to the Fire District**

Defendants argue that the Fire District and Fire Department cannot be held liable, because Plaintiff has not established *Monell* liability, which requires Plaintiff to plausibly allege that the two entities are themselves responsible for the alleged constitutional violations.   They argue that Plaintiff did not adequately plead facts that demonstrate that the Fire District and Fire Department failed to train its employees or that there were actions taken by officials or policy makers that caused the underlying constitutional violations.   Again, this Court disagrees.

Claims against the Fire District[9] are analyzed under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny. *Ratajack*, 178 F. Supp. 3d 118, 149 (S.D.N.Y. 2016); *see Lozada v. Weilminster*, 92 F. Supp. 3d 76, 106-07 (E.D.N.Y. 2015) (considering a *Monell* claim against the fire district); *Fotopolous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 372-75 (E.D.N.Y. 2014) (same); *see also Klemow v. City of Kingston*, No. 84-CV-1477, 1987 WL 28138, at *3 (N.D.N.Y. Dec. 17, 1987) ("In [*Monell*] . . . , the Supreme Court held that . . . political subdivisions of the state can be held liable as 'persons' under § 1983 for civil rights[ ] violations caused by their official policies, or customs.").

The existence of a municipal policy that gives rise to *Monell* liability can be established in four ways: (1) a formal policy endorsed by the municipality, *Turpin v. Mailet*, 619 F.2d 196, 199 (2d Cir. 1980); (2) actions directed by the government's "authorized decision makers" or "those who establish governmental

---

[9] Defendants assert that the Fire District, not the Fire Department, should be held liable as Plaintiff was officially an employee of only the Fire District. (ECF No. 27, Mot. to Dismiss at 20.)  The Court hereby dismisses the Fire Department as a party due to its status as a "political subdivision" of the Fire District, but finds that the Fire District remains the proper, liable party. *State Farm Fire & Cas. Co. v. Vill. of Bronxville*, 805 N.Y.S.2d 651, 652 (2005)(finding that a fire district "possesses virtually total supervision and control over all aspects of the creation and staffing of fire companies as well as over the rules and regulations governing firefighting practices and procedures," and "is answerable for the negligence of its firefighters committed in the course of their duties")(quoting *Knapp v. Union Vale Fire Co.*, 529 N.Y.S.2d 132)); *Froelich v. S. Wilson Volunteer Fire Co.*, 156 N.Y.S.3d 613, 616 (2021)("A fire district is a 'wholly independent political subdivision whose members, including its volunteer firemen, are employees of the district and not of the town.")(quotation and citation omitted)).

policy," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, *see Turpin*, 619 F.2d at 199; or (4) a "constitutional violation resulting from [policymakers'] failure to train municipal employees." *City of Canton v. Harris*, 489 U.S. 378, 380 (1989); *Naples v. Stefanelli*, 972 F. Supp. 2d 373, 387 (E.D.N.Y. 2013).

"Official municipal policy [ ] includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (discussing *Monell*); *see Hardwick Barrella v. Vill. of Freeport*, 43 F. Supp. 3d 136, 183 (E.D.N.Y. 2014), *aff'd*, 814 F.3d 594 (2d Cir. 2016) (finding that a decision-maker serving a final-policy making position can establish the municipality's policy); *see also Fierro v. New York City Dept. of Educ.*, 994 F. Supp. 2d 581, 588 (S.D.N.Y. 2014). A policy need not be officially promulgated for a municipality, or here, the Fire District, to face liability, however. *Green v. City of New York*, 465 F.3d 65, 80 (2d. Cir. 2006) ("The alleged custom or practice need not be embodied in a rule or regulation, however, the alleged practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials."); *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement is

satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.")

As the Supreme Court instructed, "if the decision to adopt that particular course of action is properly made by that government's authorized decision-makers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur*, 475 U.S. 469, 481. Here, Plaintiff has plausibly alleged *Monell* liability because of the involvement of the Individual Defendants, all of whom were authorized, high-level decision makers, who directly participated in, witnessed, or turned a blind eye after being made aware of the violations of Plaintiff's constitutional rights, and who failed to train the officials who engaged in the violations of Plaintiff's constitutional rights. Individual Defendants are three of the five Lakeview Fire District Commissioners, and are also former and current Chiefs and Lieutenants, who are alleged to have persistently participated in constitutional violations and retaliatory conduct and/or voted to terminate Plaintiff's employment and insurance disability benefits without a hearing. Plaintiff has plausibly pled that the Defendants—Commissioner Koppel, Commissioner Senti Jr., Commissioner McNeill, Lieutenant and former Chief Senti III, and current Chief Galia—are municipal

policymakers with "final policymaking power" on behalf of the Fire District in areas involving work place conduct and safety, suspension, removal, disciplinary penalties, policy setting, and termination of Fire District employees such as Plaintiff. (ECF No. 20, ¶¶ 57, 70, 75, 77, 88.) The Amended Complaint's allegations lead to the plausible conclusion that Lakeview's official policymakers were chiefly involved in harassing and retaliating against Plaintiff and depriving him of his constitutional rights, his rank, his employment, and his insurance benefits.

Plaintiff, moreover, has sufficiently alleged that the Individual Defendants uniformly acted to harass or otherwise punish Plaintiff, and other employees who opposed or reported the Individual Defendants' wrongdoing, in an open and widespread manner. Even if none of the Individual Defendants on their own could be considered a decision maker, such "persistent and widespread" practices by, between and in support of Individual Defendants, all of whom were high-level officials of Lakeview can be attributed to the Fire Department and Fire District as a whole. *Connick*, 563 U.S. at 61. Indeed, Plaintiff has plausibly alleged that the Fire District knowingly allowed three of the five Individual Defendants, who are related by blood or marriage to other high-ranking officials, to abuse their authority and the resources of the District to violate Plaintiff's constitutional

rights. Plaintiff's Amended Complaint plausibly alleges these municipal Defendant officers subjected Plaintiff to harassment after he exercised his right to free speech and terminated his benefits without affording him due process. Plaintiff's allegations are sufficient for purposes of *Monell*, and this Court denies dismissal of Plaintiff's claims against the Fire District.

## CONCLUSION

For the forgoing reasons, Defendants' motion to dismiss is DENIED in part and GRANTED in part.  Defendants' motion to dismiss Plaintiff's claims for violations of his First Amendment and Fourteenth Amendment rights is DENIED.  Defendants' motion to dismiss Plaintiff's Fifth Amendment claim and the Fire Department as a party is GRANTED.  Because claims under 42 U.S.C. § 1983 remain, Defendants' motion to dismiss Plaintiff's state law claims on supplemental jurisdiction grounds is DENIED.  The parties are directed to confer and jointly advise this Court within seven business days of the date of this Order, whether they will schedule a settlement conference with Magistrate Judge James Wicks and/or proceed to discovery in this case.

**SO ORDERED**

Dated:    September 26, 2022

          Brooklyn, New York

                                    _____
                                              /s/

                                    **HON. KIYO A. MATSUMOTO**

                                    United States District Judge

                                    Eastern District of New York